# Davidson's Adm'x et al. v. Davidson.

(Decided June 3, 1938.)

'RICHARDSON & REDFORD and RODES & WILLOCK for appellants.

JOHN L. STOUT and GUY H. HERDMAN for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

At about Christmas of the year 1918, B. G. Davidson died intestate at his home in Bowling Green, Kentucky, where he was then living and stationed as the local representative and manager in charge of the branch office of Davidson Brothers, a wholesale grocery business, having its main office and place of business at Glasgow, Kentucky.

Davidson Brothers was a corporation and was operated by the four Davidson brothers, W. J., H. E., G. P. and the deceased, B. G. Davidson, who held and owned in equal shares practically all of the $500,000 capital stock of the corporation.

It appears that this large business began as a partnership and was, both before and after its incorporation in 1908, closely held by these brothers as a family built, owned and controlled business, which they continued to run after its incorporation as their partnership.

At the time of B. G. Davidson's death in 1918, he left surviving him his widow, Kate Depp Davidson, and their two infant children, a daughter, Mary Katherine, nine years of age, and a son, B. G. Davidson, Jr., four years of age.

Thereupon G. P. Davidson, one of the deceased's three brothers surviving him and co-owners with him of Davidson Brothers, was duly appointed and qualified as administrator of the estate of this deceased brother. Further, on February 12, 1919, he was also, by order of the Warren circuit court, appointed guardian for the above named infant children of his deceased brother, which trust he accepted and duly qualified as guardian for them by executing as principal, with his brothers, H. E. and W. J. Davidson, as sureties, a covenant or

fiduciary bond to the plaintiff, Commonwealth of Kentucky, conditioned that he would faithfully discharge his assumed trust or guardianship in all respects as required by law.

On September 20, 1934, some fifteen years after Mr. Davidson's appointment and assumption of the duties of this guardianship and following his removal as guardian for these infants, upon complaint made of his failure to make proper settlement of his guardian's account with them covering this period, two separate actions were filed in the name of the Commonwealth in the Warren circuit court, for the use and benefit of each of these above named wards, against the defendants, G. P. Davidson and the sureties upon his bond, alleging Davidson's failure to make a proper accounting to his wards of his guardianship accounts had with them and seeking recovery against them of large amounts alleged owing them by reason of Davidson's failure to properly discharge his guardianship duties.

Many pleadings were filed and voluminous proof heard, when, upon consolidation of these two actions and their submission to the learned chancellor, Judge Porter Sims, for judgment, he adjudged, in harmony with his written memorandum opinion, that the plaintiffs were entitled to a recovery in part of the amount sued for.

Complaining of this judgment, awarding recovery against them, defendants have appealed, contending that no amount was due and owing by them upon a proper accounting, but, on the other hand, that they were entitled to a recovery against the wards upon their counterclaim filed in the actions. The appellees have also prosecuted a cross-appeal, contending that the court erred in not granting them the full extent of the relief sued for.

These questions we find have been clearly, fairly and thoroughly considered and adjudged by the learned trial court in its able opinion, and as it is in complete accord with our views, we have concluded to adopt it as our own. It is as follows:

"B. G. Davidson, Sr., died about Christmas, 1918, leaving a widow, Mrs. Kate Depp Davidson, and two children, Mary Katherine, eight years of age, and B. G., Jr., four years of age. At the time

of his death, he was in charge of the Bowling Green branch house of Davidson Brothers, which was a wholesale grocery, receiving a salary of $3,500.00 per annum. Davidson Brothers will hereinafter be referred to as the company.

"The business started as a partnership, consisting of four brothers, W. J., H. E., G. P. and B. G. Davidson, Sr. In 1908 it was incorporated, the four brothers and their close friend and associate, Mr. W. P. Combs, owning the entire capital stock of $65,000.00. Even after the business was incorporated, it was conducted along the lines of a partnership, each stockholder using the company as his bank and borrowing from it large sums of money. The business prospered and the incorporators, instead of drawing out the earnings, used them to increase the capital stock until in 1922 the company had a capital of $500,000.00 represented by stock being issued to the original incorporators in the form of dividends. The only other stockholders were three or four trusted and valued employees, who had been with the company a long number of years and they owned a few shares of stock each.

"Mr. G. P. Davidson qualified as administrator of his brother and was appointed guardian of the two children in 1919, but really did not act as guardian or receive any funds until July 2, 1923. Mr. Davidson, at his death, owed the corporation $21,592.64 for money he had borrowed from it. It appears from this record that the administrator handled the estate of his deceased brother to suit himself, making no formal final settlement. We do not mean the administrator misappropriated any of the estate, yet he ignored the statutory regulations in such matters, as he did later in handling the estate of his wards.

"On July 2, 1923, the administrator, without making a final settlement, appears to have divided his deceased brother's estate among his heirs and on this date he appears to have qualified as guardian for the two children. In this de facto settlement the widow assumed one-half of the indebtedness her husband owed the company and the guardian for his wards assumed the other one-half, executing a

note to the company, as guardian, for each ward in the sum of $5,398.16.

"Mr. Davidson's estate at his death consisted of 410 shares of stock in the company and 35 shares of Samson Tobacco Company stock, all of which was valued at par. As stated above, the administrator really did not settle his brother's estate, which was largely made up of the stock in the company, and he let the estate continue in the business until July, 1923. At this time the company's capital was $500,000, and the stock which had belonged to the deceased brother had increased from 410 to 923 shares. At this time the administrator divided these 923 shares equally between the widow on one side and the two children on the other; also, as above stated, the indebtedness owed by the deceased to the company was likewise divided. The widow's estate consisted of about $47,000.00 less $10,000.00 indebtedness to the company, and the estate of the two children aggregated the same amount.

"The administrator appears to have been devoted to his brother's widow, as much as if she had been his own sister, and he was just as devoted to her two children, his wards. The company had earned $49,000.00 in 1918; $70,000.00 in 1919; $43,000.00 in 1920; lost $3,000.00 in 1921; made $800.00 in 1922; and made $17,000.00 in 1923. These earnings were not paid out to the stockholders, but were reflected in the increase of the capital structure of the company, whose capital stock increased from $200,000 in 1918 to $500,000.00 in 1922. Evidently, the administrator was quite pleased with the manner in which he had handled his deceased brother's estate, having doubled it within five years. This fact perhaps accounts for his making no real settlement of the estate, but instead he divided the stock in the company owned by his brother and the debts owed the company by his brother among his heirs. Naturally, all of the Davidson brothers felt that they were rolling in wealth. The widow, Mrs. Kate Davidson, testified that the administrator of her husband's estate and the guardian of her two children told her that she and her children had more money than they could spend and encouraged her to be extravagant.

"Despite the fact the mother of his wards had a net estate of $35,000.00, the guardian borrowed $100.00 per month for each ward from the company and turned it over to their mother for the support of her children, who at that time were thirteen and nine years of age respectively. More than this, the mother was allowed to borrow $300.00 per month from the company for her own support, and this $400.00 was sent to her in a lump sum each month, after deducting whatever staple groceries and supplies she bought from the company. At this time the widow's father was a rich man, for Bowling Green and Glasgow, and he assisted his daughter. This record shows that while Mr. Davidson lived he earned $3,500.00 per year which supported his family well during the high prices existing in the time of the World War. Yet, after his death, the family income was increased from $3,500.00 to $4,800.00 per year and this was not sufficient for the widow and her two small children, as her father customarily gave her money; also, he gave her two cars during this time.

"This arrangement. and the extravagant manner of living for these two children was inexcusable, especially when every dollar of it was being borrowed and no accounting was being required of the mother of the children as to how she was spending the money turned over to her for their support. She did not spend $200.00 per month on these children and the guardian knew she was not doing so. He was in her home and knew how the money was being spent. The widow testified that she and her children took expensive trips and that she remodeled the house in which they lived a number of times, and even donated $1,000 to the Baptist Church. This was all known to the guardian. This record shows, and human experience bears it out, that $20.00 or $25.00 each month would have been ample for the support of these children. However, a mother with an estate of between $35,000.00 and $40,000.00 is abundantly able to support her two children. But nothing is so intoxicating as success. The administrator had doubled the estate of his deceased brother in the five year interim between 1918 and 1923 by keeping his holdings in the company intact and not settling the estate, as required

by law. As guardian for his brother's two children, he evidently reasoned that if he could keep their estate invested in this business until they reached their majority, he could make them rich. It mattered not to him that he was borrowing $100.00 per month for each ward to give to their mother, whose duty it was to support them out of her means, as she was amply able to do, because he had their money invested in an active business that had grown by leaps and bounds and he would make them rich.

"But post-war conditions brought changes, and 1923 was the last big year the company had. The earnings decreased * * until the company's assets all but vanished. It paid no dividends from 1922 to 1928, when it paid 6%, which was not earned. The officers and stockholders of the company were waiting for prosperity to return to their company and during all this time the guardian held this large block of stock in the company without receiving dividends, and paying 6% interest on the $200.00 per month he was borrowing for his wards. His wards inherited about $2,700.00 each from their grandfather Depp in 1927, and this $5,400.00 their guardian paid to the company on April 30, 1927, as a credit on their indebtedness to it.

"At the end of the year 1932, Mr. G. P. Davidson, as guardian for these two children, was owing the company $29,614.20. On January 1, 1933, he settled this entire indebtedness by selling to the company 90 shares of its stock belonging to each ward at the price of $60.00 per share, the remaining $18,817.88 the guardian satisfied by selling the company 302 shares of his individual stock in the company at the same price of $60.00 per share. About this same time the other large stockholders settled their indebtedness to the company, aggregating about $120,000.00, by turning over a sufficient number of shares of stock they held in it to pay what they were owing the company. However, we believe the record shows the widow, Mrs. Davidson, paid her indebtedness of about $24,000.00 to the company in 1926 by turning over to it a sufficient number of shares of her stock at $107.00 per share.

"When the company made money, the capital stock was increased by a stock dividend paid to seven or eight stockholders, and when it did not make money, these stockholders borrowed large sums from the company, which debts were satisfied as above set out. Practically all the stock of the company was owned by the four branches of the Davidson family and by Mr. Combs, a very small portion being in the hands of a few of their trusted employees.

"It was a great blow to the Davidson family when they at last realized their splendid and highly remunerative business had practically vanished. As is often the case when money leaves, bad feeling takes its place. Mr. G. P. Davidson had acted as guardian in the same manner he acted as administrator, paying no attention to the statutes governing such matters and making but two settlements, one in 1928, which covered the five year period from 1923 to that date, and the other in 1933. In 1934, Miss Mary Katherine Davidson became of age and she brought suit against her former guardian and his bondsmen, alleging that she had no notice of the settlement of 1928 and no vouchers were filed in support thereof, therefore it was void. She sought to recover from her guardian and his bondsmen the $100.00 per month her guardian had paid her mother for her support with interest, the $5,400.00 the guardian had paid for the debt of her father and the $2,700.00 Depp legacy, a total of $13,824.16. By a third amended petition filed June 3, 1936, she alleged the 231 shares of Davidson Brothers stock and 8½ shares of Samson Tobacco Company stock were actually worth $23,950.00 at the time the guardian received same and her guardian is liable to her for this sum with 4% interest from July 2, 1923; also he is liable to her for the Depp legacy of $2,700.00 with 4% interest from April 30, 1927, making a total of $41,390.80. B. G. Davidson, Jr., had the Warren County Court to remove his uncle G. P. Davidson as his guardian and his mother appointed in his stead, and she brought the same suit for him that his sister had brought in her own right.

"The defendants filed a joint and separate answer, counterclaim and setoff, in which they

pleaded the settlement of July, 1928, and showed how the guardian had handled his wards' estates, which settlement was approved by the county judge and had never been appealed from, set aside or vacated, and the plaintiffs were estopped from recovering any part of the Depp legacy. Defendants further pleaded the mother of the wards agreed with the guardian that he should pay her $100.00 each per month for the support, education and maintenance of the children, which was approved by the judge of the county court as a reasonable sum; that the guardian was compelled to and did borrow $2,999.19 from the company to support his wards and in addition to that he paid the ancestral debt of each ward in the sum of $5,-398.16. Defendants seek to recover these sums with interest and have the court approve the sale of 90 shares of stock of each child at $60.00 per share to pay the ancestral debt.

"Later defendants filed an amended answer, counterclaim, set off and cross-petition, making Mrs. Davidson individually a party and alleging that if the court held $100.00 was too much to pay for the support, education and maintenance of each child, the defendants should recover against Mrs. Davidson any sums recovered against them. Mr. G. P. Davidson died during the pendency of this action and it was revived against his administratrix, Mrs. Grace Davidson Comer. B. G. Davidson, Jr., became of age December 7, 1935, and he was substituted for his guardian. These two actions have been consolidated and tried together. Mrs. Davidson, the widow, demurred to the third paragraph of the amended answer, counterclaim, setoff and cross-petition, wherein judgment is sought against her, which demurrer is now overruled.

"This court has previously held in these consolidated causes that the reports and findings of Hon. Chas. R. Bell, special commissioner, were not a final judgment. This record shows the court was correct in that holding, inasmuch as there was no order made appointing Mr. Bell special commissioner, nor was there any order made filing his reports. Since these actions were instituted, plaintiffs attempted to give force and effect to Mr. Bell's

appointment as special commissioner and his findings as such by entering nunc pro tunc orders. In a memorandum opinion rendered December 30, 1935, we held that the orders entered in the county court in these two actions were not final.

"The first question for the court to determine is whether the guardian was justified in advancing the mother $200.00 per month for the support, education and maintenance of these two children when she had an estate of between $35,000 and $40,000. It was held in Commonwealth for the Use of Lee v. Lee, 120 Ky. 433, 86 S. W. 990, 89 S. W. 731, 28 Ky. Law Rep. 596, that parents are ordinarily required to support their children, although if the parent is financially unable to support the child and if the child has a separate estate, the parent is allowed to charge the estate of the child for its support. The rule laid down in this case is still the law in Kentucky. Therefore, we hold the guardian was not justified in advancing the mother $200.00 per month for the support, education and maintenance of these two children.

"The next question is, was the guardian justified in using more than the income from his wards' estates in their support; and was he justified in consuming the corpus of their estate, or any part thereof, in their support? Section 2034, Kentucky Statutes, forbids the guardian to expend more than the income from the ward's estate in the support, education and maintenance of the ward. This statute makes two exceptions:

" '(1.) When the ward is of such tender years or infirm health that he cannot be bound out as an apprentice, or no suitable person will take him as such.

" '(2.) When it is best for the ward that the principal of his personal estate shall be applied for his board and tuition.'

"None of these conditions prevailed in this case and the guardian was not justified in using any part of the corpus of the estate of his wards. Com., to Use of Lee v. Lee, supra; Watson v. Watson, 183 Ky. 516, 209 S. W. 524, 3 A. L. R., 1575.

"These Davidson children attempt to charge

their guardian and his bondsmen, their uncles, with 462 shares of Davidson Brothers stock at par, with 4% interest from the time the stock came into the guardian's hands, which would amount to $48,-048.00, alleging that under section 4706, Kentucky Statutes, he should have invested the estate in safe, interest bearing securities, such as a prudent business man would regard as safe investments. Davidson Brothers was a family business; it had made the family rich; from the time their father died in 1918 until 1922, their guardian, as administrator of their father's estate, had doubled the value of that estate by holding on to this stock; likewise he had doubled the value of his wards' estate in so doing. Of course, he should have settled his brother's estate, but this record shows there was no sale for this stock; no person of business acumen would have bought a share of it, nor would the members of the Davidson family have sold a share to an outsider. We doubt if the guardian could have found any sale for the 462 shares of this stock his wards owned in the company. Certainly nobody would have purchased it but the company itself, and the principal stockholders did not want to buy, as they thought they would be taking advantage of their dead brother's children. However, the guardian could have, and should have, made an effort to settle his brother's estate and have invested his wards' property as provided by section 4706, Kentucky Statutes. Most certainly the company would have taken sufficient of this stock at par to have squared the senior B. G. Davidson's indebtedness to it, as that is the only manner in which the company could have collected its debt.

"Durretts Guardian v. Commonwealth, 90 Ky. 312, 14 S. W. 189, 12 Ky. Law Rep. 207, holds a guardian is not only chargeable with mala fides but for incompetency; 'he must possess such legal knowledge as is needful to the proper execution of the trust.' Here the guardian had no authority to execute his wards' notes for $10,796.32, their proportionate part of their father's debt to the company, and to carry it as an indebtedness of his wards for almost ten years and pay 6% interest thereon. In our opinion, the guardian should have sold sufficient of his wards' stock in the company

to have paid their ancestor's indebtedness at the time the stock came into his hands as guardian. Had he done this, the company would have paid par for a sufficient amount of this stock to square this indebtedness. It would have taken only about 110 shares of stock to have paid this $10,796.32. As it is, the guardian has paid this debt by the sale of 180 shares at $60.00 a share and has caused his wards a loss of $40.00 per share on the 180 shares or $7,200.00. It is our opinion the guardian should be required to account to his wards for this $7,-200.00, his carrying this debt has cost them. It is true it wouldn't have taken but 110 shares of the stock to pay the ancestral indebtedness in 1923, while it took 180 shares to pay it when the guardian satisfied same, and it might be reasoned that the wards lost 70 shares of stock. Such reasoning is logical, and the 70 shares of stock would be $7,000.00, while under our findings the guardian will owe $7,200.00. This convinces us that the conclusion we have reached is sound.

"The guardian must be charged with the interest he paid Davidson Brothers on this ancestral debt, because had he satisfied same, when his wards' estate came in his hands, he would have saved this large item of interest. Also, he must be charged with the Depp legacy of $5,400.00, with 4% interest thereon from January 1, 1928. The guardian had no authority to incur any indebtedness for his wards under the facts contained in this record; and if he had no authority to incur this indebtedness, he had none to use the inheritance of his wards in paying same.

"But a court of equity under all the facts and circumstances shown in this record can not hold the guardian and his bondsmen liable for the par value of this 462 shares of stock when it came in his hands. He was attempting to preserve his wards' interest in the family business that over a period of more than ten years had been a great money maker. There being no sale for his wards' stock at the time it came in the guardian's hands, it is most difficult to place a value on it. The book value of the stock of a corporation amounts to very little where there is no sale for the stock. The $18,817.88 the guardian borrowed from the com-

pany and advanced his wards was repaid by the guardian personally and the wards have lost nothing thereby. Then, too, in 1926, the guardian made a gift to his wards of $2,400.00; and W. J. Davidson, surety on his bond, made a gift of $5,-000.00 to the estate of B. G. Davidson, Sr., and the children benefited from this.

"We have not overlooked the dividends from the Samson. Tobacco Company stock from 1925 to 1927, inclusive, and the few dollars from the Steffey estate and $2,792.00 dividend in 1928 on the 462 shares of the company stock, all of which aggregate something over $4,000.00. We allow the guardian credit for his spending this income from the wards' estate. In the eight years he was guardian for Miss Mary Katherine Davidson and the twelve years he was guardian for B. G. Davidson, Jr., he should be entitled to spend some $2,000.00 on each of his wards for luxuries and extraordinary advantages when they occupied the social position that these children did. This was income from his wards' estate and the guardian was justified in expending it on them.

"Had the guardian asked the court to allow him to sell 90 shares of the stock in the company belonging to each ward at $60.00 per share to pay the ancestral debt, the court would have done so. When the guardian failed to obtain the consent of the chancellor in advance of his action, the chanceller is justified in later ratifying such action, if it would have been approved in the first place. Had the guardian petitioned this court for authority to sell these 180 shares of the company stock at $60.00 per share, authority of such sale would have been granted. Therefore, the court now confirms and satifies the sale of this stock by the guardian. See Watson v. Watson, supra.

"But for the reasons set out above, we do not allow the guardian credit for the entire $10,796.32 paid with the proceeds of the sale of this stock; he should have paid this debt and settled his brother's estate and should never have executed his wards' notes therefor. While we do not think it fair and equitable under this record to charge the guardian with the entire 462 shares of this stock at par, and

interest thereon from the time it came into his hands, yet we do charge him with the difference between the par value of this 180 shares of stock and the price he sold it at of $60.00, or $7,200.00; also, we charge him with the interest he paid thereon, because we think his delay in paying his wards' part of their ancestor's debt has been to their detriment in this sum.

"We also charge him with the Depp legacy of $5,400.00 with 4% interest thereon, as is provided by section 2035a-1, Kentucky Statutes, which interest runs from January 1, 1928.

"No part of this judgment may be recovered against Mrs. Kate Davidson, because what money belonging to the children the guardian paid her was done freely, willingly and voluntarily on his part, and no accounting was ever required of her by him. He can not put in her hands money as guardian of her children to be squandered on them without any reason, and later, when he is compelled to make it good, require her to reimburse him. Defendants' counterclaim for the amount the guardian owes Davidson Brothers is dismissed and the defendants will recover nothing thereon.

"A judgment may be drawn for plaintiffs in each of these actions for the respective amounts due them as indicated in this opinion, and each of the plaintiffs will recover their costs. Objections and exceptions will be reserved and an appeal to the Court of Appeals granted to all parties so desiring."

Judgment affirmed.